UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:19-cr-108 |
| -v- | ) | |
| | ) | HONORABLE PAUL L. MALONEY |
| JEREMY DARNELL MORTON, | ) | |
| Defendant. | ) | |
| | ) | |

## SUPPLEMENTAL OPINION

On July 29, 2019, the Court held an evidentiary hearing on Defendant Jeremy Morton's motion to suppress evidence obtained from him on September 17, 2015. After evaluating the evidence and argument, the Court denied the motion from the bench, concluding that the officer's seizure of Morton was justified as a *Terry*[1] stop to allow other officers to execute the search warrant without tipping off the hotel room occupants.

However, the government had also argued that probable cause supported the seizure, such that the officers could lawfully arrest Morton at the time they encountered him. The Court reserved on this issue. Now, after a review of the evidence, the Court finds that Detective Hartman and the rest of the officers who encountered Morton at the Comfort Inn had probable cause to arrest him, which provides an independent rationale for denying the motion to suppress.

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

## I.

Three murders rocked Muskegon Heights between August and September of 2015. First, a man named Thedrick Bryant was shot and killed in a shootout on August 30, 2015 at East Park Manor in Muskegon Heights. Several other men were shot during this altercation, including a man named Darnell Byrd.

Then, on September 4, 2015, a man named Marquis Grider-Sims was shot and killed in Muskegon Heights. Grider-Sims had been a cooperating witness in the investigation of the August 30 shooting.

And finally, Darnell Byrd was shot 13 times in the early morning hours on September 5, 2015. Witnesses saw two men running from the scene.

The cases were investigated by Detective Jason Hartman and the Muskegon Major Case Task Force. Detective Hartman worked for the Michigan State Police and was assigned to the Task Force to work alongside the Muskegon Heights Police Department, the Muskegon County Sheriff's Department, a Muskegon city detective, and the FBI. As part of the investigation, the Task Force interviewed many people with knowledge of one or more of the shootings.

They learned that the August 30, 2015 shooting had been precipitated by an altercation between two groups at a bar in Muskegon. Some of the women involved in the altercation called Defendant Jeremy Morton. Morton and his compatriots, Darnell Byrd and Josiah Fousse, met up with the women at another bar in Muskegon.

Officers also learned that once reunited with their associates, the entire group drove to East Park Manor in Muskegon Heights, where they believed the other participants to the

fight had gone. Once there, Morton had the women with him point out the other persons involved in the fight and then directed the women to leave. Before they did so, Morton told them that "we protect each other" or "we back each other up." The men—Morton, Byrd, and Fousse—then armed themselves for a confrontation. Almost immediately, other people in the housing project noticed their presence; Morton and his friends were not welcome.

A shootout ensued. A man named Thedrick Bryant was killed. Three others were shot, including Darnell Byrd, although they did not die as a result of their injuries. After the shootout, Morton took Byrd to the hospital. Morton then returned to his residence on 7th Street in Muskegon Heights. Two of the women were there: Shavonna Stinson and Kasandre Brown. He told them that there had been a shooting the night before, and that Byrd had been shot.

Byrd was treated at the hospital and then booked into the Muskegon County Jail. He was released on bond on September 3, 2015. His bond was paid by Morton's mother and another associate. Soon after, Byrd told Stinson that he was afraid of Morton and that he worried that he might end up dead in an alley. At the same time, other Morton compatriots were openly discussing Byrd's suspected cooperation with law enforcement on the August 30 homicide. On September 4, 2015, Kierelle Burns told Columbus Edwards that Byrd needed to be killed because of his suspected cooperation. Burns told Edwards that "they" had Byrd in a hotel and were feeding him pills and alcohol. Burns told Edwards that after taking care of Byrd, "they" would go hideout at Morton's residence in Detroit.

The guest records revealed that Shamarea Salazar was staying at the hotel, a Quality Inn. Officers knew that Salazar was Morton's girlfriend. During surveillance on September

17, 2015, officers observed Salazar leaving the motel in a vehicle. Police executed a traffic stop of Salazar, who said she was staying at the Quality Inn with Morton and her family. She did not mention any other people.

While the traffic stop was ongoing, other officers observed Morton leave the hotel and enter a nearby Comfort Inn and Suites. Officers followed but could not locate Morton. They asked hotel staff, who said a man fitting the description had gone in the men's bathroom. The officers found no one inside but encountered Morton in a hallway within the motel. Officers immediately patted Morton down for weapons and felt a large bulge in Morton's front pants pocket. Officers asked what it was, and Morton said it was "a few thousand dollars of his mother's money." Morton also stated that he had planned to rent a room at the Comfort Inn. Officers told Morton that they had a search warrant for his room at the Quality Inn, but he denied having a room and claimed that his girlfriend (Salazar) was supposed to check out.

Police handcuffed Morton and returned him to the Quality Inn. While he remained in the car, officers went to the motel room door and knocked. They identified themselves as police, but the occupants refused to open the door. Eventually, police stopped knocking and forced their way into the room. Inside, police discovered Fousse and Burns.

While all this was ongoing at the Quality Inn, other police officers remained at the Comfort Inn. They reviewed surveillance footage, which showed Morton twice entering and quickly exiting the men's bathroom. Police searched the bathroom and discovered a clear plastic bag of narcotics, hidden inside a toilet tank. These officers then returned to the Quality Inn and seized the money from Morton's front pocket ($8,380.76).

4

## II.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. Amend. IV. Warrantless arrests are presumptively unreasonable. However, a police officer may conduct a warrantless arrest of an individual when the officer has probable cause to believe that the individual has committed a felony or misdemeanor in the officer's presence or a felony away from the officer's presence. *United States v. Watson*, 423 U.S. 411, 417–18 (1976). "[T]he Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless arrest in a public place even though he had adequate opportunity to procure a warrant after developing probable cause for arrest." *Id.* at 427 (Powell, J., Concurring).  Therefore, the inquiry is "not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest." *Id.* at 417.

Probable cause means "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). It requires a "fair probability," *Illinois v. Gates*, 462 U.S. 213, 238 (1983), a term that the Supreme Court has never defined but has instead described as a "commonsense, practical question" to be judged from the totality of the circumstances. *Id.* at 230. "In determining whether probable cause exists, we may not look to events that occurred after the search or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the search." *Smith v. Thornburg*, 136 F.3d 1070, 1075 (6th Cir. 1998) (citing *United States v. Ferguson*, 8 F.3d 385, 391–92 (6th Cir. 1993) (en banc)).

Here, based on the facts that were known to the officers at the time they seized Morton, they had probable cause to believe that he participated in a conspiracy to commit murder.

First, the police had evidence that placed Morton at the scene of the killing on August 30. The women with Morton told police that he told them to leave prior to confronting the offending parties, precipitating the shooting. As they left, they saw Fousse, Byrd, and Morton walking toward the residence where the shooting occurred. Surveillance footage also tied the vehicle Morton used to the scene.

Second, there is no dispute that Byrd was at the shootout on August 30th, or that he was subsequently hospitalized and arrested for his role in the shooting. It is a fair probability that his death was precipitated by Morton's belief that Byrd had "ratted." As witnesses told police on September 5, 2015, Burns reported that "they" were holding Byrd in a hotel room and "feeding him pills and booze." Burns said that after Byrd was dead, "they" would go to Detroit to stay at Morton's condominium. These facts give rise to probable cause that Morton was responsible for Byrd's death.

Morton had a motive known to police: he feared that Byrd would incriminate him for the events of August 30th. He made statements to his associates like "Byrd isn't good for me anymore." Byrd told *his* associates that he was worried Morton would "get rid of" him because he couldn't act as protection because of his injuries. And Morton's knowledge and participation in the plan could be inferred because Burns said that they all planned to hide out at Morton's condo in Detroit once Byrd was killed. After Byrd was killed, police also learned that Burns was in hiding with Morton, and Morton would not let Burns leave. This

also tends to suggest that Morton was attempting to evade law enforcement, who he knew were investigating his role in the killings.

From these facts, the Court concludes that under the totality of the circumstances, probable cause existed to arrest Morton for the killings of Bryant and/or Byrd. Accordingly, the subsequent seizure of the cash from Morton—taken while he was detained—would not violate the Fourth Amendment.

## III.

Based on the foregoing, law enforcement had probable cause to arrest Jeremy Morton at the time they encountered him at the Comfort Inn. Accordingly, Defendant's motion to suppress (ECF No. 20) fails for this additional reason.

Date:  November 21, 2019              /s/ Paul L. Maloney
                                            Paul L. Maloney
                                            United States District Judge